# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 23 - 20089 -CR - Williams

UNITED STATES OF AMERICA

v.

ALVARO LEDO NASS,

      Defendant.

_____/

## FACTUAL PROFFER

The United States of America and Alvaro LEDO Nass (the "defendant") stipulate and agree that the information stated herein is true and accurate and sufficient basis for the defendant's plea of guilty to the money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h) charged in the instant case and the forfeiture of the assets identified in the Superseding Information.  Had this matter proceeded to trial, the defendant stipulates and agrees that the government would have proven the facts alleged below beyond a reasonable doubt.

1.      From in or around September 2011 to in or around March 2015, the defendant held various positions as an official at Venezuela's state-owned and state-controlled oil company, Petróleos de Venezuela, S.A. ("PDVSA") and its subsidiaries.  In particular, from in or around November 2012 to in or around November 2014, the defendant served as Secretary of the Board of Directors of PDVSA, and from in or around July 2014 to in or around March 2015, the defendant served as General Counsel of PDVSA.  At all relevant times, the President of the Republic of Venezuela appointed the members of the board of PDVSA, the company responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy



1

resources in Venezuela and also provided funding for other operations of the Venezuelan government. During the relevant period, PDVSA had a significant operating budget and awarded billions of U.S. dollars' worth of contracts each year. PDVSA was also Venezuela's primary source of income and foreign currency (namely, U.S. dollars and Euros), and served as the source of foreign currency used to fund several corrupt foreign exchange schemes.

2.      Starting in or around 2012 and continuing until in or around 2017, the defendant and others engaged in various foreign currency exchange schemes using loan contracts with PDVSA that were unlawfully obtained via bribes and kickbacks. These schemes exploited the Republic of Venezuela's fixed foreign currency exchange rate, which accorded Venezuelan Bolivars an artificially high value compared to the open foreign currency exchange market. In exchange for his participation in the bribery scheme, including his facilitation of payments to co-conspirators, the defendant was promised and received a portion of the illicit loan proceeds as bribes. The defendant conspired with others to engage in monetary transactions involving criminally derived property of a value greater than $10,000 in U.S. currency in the Southern District of Florida and elsewhere.

EATON-RANTOR LOAN SCHEME

3.      For example, the defendant conspired with others, including Carmelo Urdaneta Aqui ("Urdaneta"), Venezuela Official 1, Francisco Convit Guruceaga ("Convit"), and Co-Conspirators 2, 3, and 7, in a corrupt foreign currency exchange scheme involving a loan contract with PDVSA. On or about December 17, 2014, Rantor Capital C.A. ("Rantor"), a Venezuelan shell company, executed a contract with PDVSA in which Rantor agreed to loan 7.2 billion Venezuelan Bolivars to PDVSA. On or about December 23, 2014, Rantor executed an assignment contract with Eaton Global Services Limited ("Eaton"), in which Rantor assigned its rights as PDVSA's creditor under the loan contract to Eaton and in which PDVSA was given the right to

cancel the debt within 180 days by paying the Euro equivalent of $600 million in U.S. currency (the "Eaton-Rantor Loan Scheme"). The Eaton-Rantor Loan Scheme enabled the defendant and his co-conspirators to obtain access to the Venezuelan government's fixed foreign currency exchange rate, which valued the Venezuelan Bolivar artificially high compared to the rate available on the open market. The defendant and his co-conspirators exploited the difference between the two foreign currency exchange rates, resulting in the equivalent of hundreds of millions of U.S. dollars in profits.

4.      In short, Eaton, a company controlled by members of the conspiracy, ended up with the right to loan PDVSA about 7.2 billion Bolivars (worth around $50 million in U.S. currency based on the open market exchange rate) and to be repaid in the Euro equivalent of $600 million in U.S. currency, based on an official fixed exchange rate, when the debt was cancelled, profiting by the Euro equivalent of approximately $550 million in U.S. currency. A significant portion of those illicit profits was paid as bribes to those involved in obtaining the loan contracts, including the defendant, who agreed to let the loan approval process proceed and to distribute the funds to certain of the co-conspirators involved in approving the contract.

5.      In and around the summer of 2015, the defendant and his co-conspirators directed a Confidential Source ("CS") to conduct transactions in proceeds derived from the scheme totaling approximately 15 million Euros, including several U.S.-Dollar wire transactions. U.S.-Dollar wire transactions transfer monies through the U.S. banking system through the use of correspondent U.S. banks, even if the U.S.-Dollar wire transaction is between two non-U.S. banking institutions.

6.      The defendant knew that the CS met with other co-conspirators, including Convit, Urdaneta, Jose Vincente Amparan Croquer ("Amparan"), also known as "Chente," and Hugo Gois

("Gois"), to launder the proceeds from the Eaton-Rantor Loan Scheme.  Some of these meetings took place in the Southern District of Florida.

7.      In addition, starting in or around January 2015, in recorded conversations and BlackBerry Messenger chats, Convit and Urdaneta each discussed separately with the CS the CS's receipt of proceeds from the Eaton-Rantor Loan Scheme, and instructed the CS on how to handle the funds.  Some of those chats occurred while the CS was in the United States, including the Southern District of Florida.

8.      In or about late 2016 or early 2017, the defendant met with Amparan, Ralph Steinmann ("Steinmann") and Luis Fernando Vuteff ("Vuteff") in Madrid, Spain.  Steinmann and Vuteff agreed with the defendant to launder the defendant's remaining portion of the Eaton-Rantor Loan Scheme proceeds being held by the CS.

9.      During the course of the Eaton Rantor Loan Scheme, the defendant understood that his co-conspirators would transfer the proceeds of the corruptly obtained loan contracts into the United States and conduct financial transactions in the United States using the proceeds of the corruptly obtained loan contracts.

10.     For example, the defendant and Co-Conspirator 3 told the CS to assign to Abraham Ortega, former PDVSA Finance Director, $5 million from the defendant's share of the proceeds from the Eaton-Rantor Loan Scheme, which amounted to approximately $15 million, as a bribe payment for another scheme.  On or about February 28, 2017, at the direction of Ortega and Gustavo Hernandez Frieri (a third-party money launderer introduced to the CS by Ortega), the CS transferred approximately $5 million from the CS's account at a financial institution in Bahamas to an account at U.S. Financial Institution 1 in New Jersey.  On or about March 14, 2017, the $5

4

million was further transferred to another account at U.S. Financial Institution 1 for the ultimate benefit of Ortega.

CONCLUSION

11.     The defendant also participated in similar loan schemes involving other companies and PDVSA, as well as other schemes involving joint ventures between other companies and PDVSA, from which he, along with other Venezuelan government officials, received bribes in exchange for their assistance. From the schemes that the defendant participated in between 2012 and 2017, he directly obtained bribe payments totaling at least approximately $11,510,025 in U.S. currency, a sum which includes approximately $1,501,000 from the Company B joint venture and the Companies C-D Loan Scheme, and approximately 7,774,000 in Euros, which was approximately $10,009,025 in U.S. currency at the time, from the Company F Loan Scheme.

12.     During all relevant times, the defendant knew that he was participating in an illegal bribery and money laundering conspiracy and that the funds he sought to transact in were the proceeds of criminal activity.  During all relevant times, it was reasonably foreseeable to the defendant that the financial institutions that were maintaining his proceeds from criminal activity would conduct U.S.-Dollar financial transactions.

13.     The defendant also understood that his co-conspirators would conduct U.S.-Dollar financial transactions with the proceeds from the criminal activity, including U.S.-Dollar financial transactions directly into the United States and the Southern District of Florida.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 3/29/23          By: _____
                       KURT K. LUNKENHEIMER
                       ASSISTANT UNITED STATES ATTORNEY

                       GLENN S. LEON
                       CHIEF, FRAUD SECTION
                       U.S. Department of Justice, Criminal Division

Date: 3/29/23          By: _____
                       PAUL A. HAYDEN
                       TRIAL ATTORNEY

Date: 1-31-23          By: _____
                       OSCAR S. RODRIGUEZ
                       ATTORNEY FOR DEFENDANT

Date: 1-31-2023        By: _____
                       ALVARO LEDO NASS
                       DEFENDANT

6