## UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

   **v.**                                        **CASE NO: 23-CR-20089-WILLIAMS**

**ALVARO LEDO NASS,**
              **Defendant**
_____/

### ALVARO LEDO NASS'S SENTENCING MEMORANDUM

The defendant, ALVARO LEDO NASS, through undersigned counsel, respectfully submits this memorandum in aid of sentencing to supplement the information contained in the Presentence Investigation Report ("PSR") and assist the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to fulfill the federal sentencing requirements of 18 U.S.C. § 3553(a).

### INTRODUCTION

At 43 years of age, Alvaro Ledo Nass comes before the Court for the very first time in his life. This is his first contact with the criminal justice system. On March 29, 2023, Alvaro Ledo Nass pled guilty to a one-count Information charging him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and 1957(a). Sentencing is scheduled for June 12, 2023.

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

Pursuant to the written plea agreement, at paragraph ("¶") 9, among other things, the government has acknowledged that Mr. Ledo Nass has rendered substantial assistance that rises to the level of substantial and extraordinary in the investigation or prosecution of other persons who have committed an offense. Accordingly, and pursuant to 18 U.S.C. §3553(e) and/or § 5K1.1 of the Sentencing Guidelines, the government has agreed to move ***at the time of sentencing*** for a departure from the advisory guideline range.

Once the Court determines the appropriate reduction for the defendant's substantial cooperation, Mr. Ledo Nass respectfully submits that based on the factors set forth in 18 U.S.C. § 3553(a), the Court should grant a further downward variance below the point determined after consideration for substantial assistance. Mr. Ledo Nass is a first-time offender who has committed a nonviolent offense. He voluntarily came to the United States without an arrest warrant, without extradition, without Indictment or any obligation, at his own expense, on November 1, 2021. He thereafter immediately began cooperating. He has been at liberty on bond since February 2023, following his arraignment. Beyond his cooperation, the Court will see that Mr. Ledo Nass's personal characteristics and attributes make it unlikely that he will reoffend and support a high probability that he will be rehabilitated without the need for a lengthy term of incarceration in the Federal prison system.

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

### SENTENCING UNDER 18:3553(a) AND THE GUIDELINES

As the Court is aware, although the Federal Sentencing Guidelines remain significant, they are no longer mandatory.   The sentencing guidelines are not the only factor to be weighed by the Court in its determination of a punishment that is sufficient, but not greater than necessary, to satisfy the purposes and goals set forth in 18 U.S.C. § 3553(a), *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Under *Gall*, the advisory guideline range does not have "any particular weight." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (en banc). As this Court is well aware, a sentencing judge must conduct his or her own evaluation of the § 3553(a) factors and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113.

This Court, after making an individualized assessment, will be able to fashion a reasonable sentence that is "sufficient, but not greater than necessary," to fulfill the federal sentencing requirements of 18 U.S.C. § 3553(a); that being, the lowest sentence that accounts for all of the relevant statutory factors. Those statutory factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the kinds of sentences available; (4) the Guidelines range; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparity; and (7) the need to provide restitution.

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

## Nature and Circumstances of the Offense

The purpose of the money laundering conspiracy was to launder funds embezzled from Petroleos de Venezuela, S.A. ("PDVSA") by Venezuelan officials.  The defendant, at the young age of 32, became an official at PDVSA and its subsidiaries.  He became a part of an already corrupt organization where the environment facilitated, in fact necessitated, his drift in that direction.  He participated with the co-conspirators in foreign currency exchange schemes using loan contracts with PDVSA and received bribe payments in return.  As time went by, his illicit conduct weighed heavily on him, and he resigned.  In 2015 and after his life was threatened, he and his family relocated to Panama; then, in 2018 they relocated to Spain.  In 2018, he hired an attorney and began cooperating with the United States government. Mr. Ledo Nass voluntarily came to the United States without an arrest warrant, without extradition, without Indictment or any obligation, at his own expense, on November 1, 2021.  He began cooperating without even knowing the charges or penalties he would face.  He has been cooperating with the U.S. government since that time.

By voluntarily coming to the United States, the defendant saved the government the time and expense of extradition.  Extradition is costly and time consuming.  As a lifelong resident of Venezuela, Mr. Ledo Nass had never before resided in the United States (he has previously travelled to the U.S. for pleasure).  He chose to come here to right this wrong and be able to move on with his life. He fully and completely cooperated and expeditiously entered a plea of guilty.  Mr. Ledo Nass has totally and unequivocally accepted responsibility for his involvement in this conspiracy.  He has

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

taken great steps to right this wrong; most importantly his ongoing cooperation with the government and forfeiture to the U.S. government every penny he received in illicit bribes. The resulting conservation of judicial and prosecutorial resources merit consideration when determining a reasonable sentence in this case. It also is significant evidence of this defendant's character.

### Alvaro Ledo Nass's Personal History and Characteristics

Alvaro Ledo Nass was born in 1980 in Venezuela.  He is the son of an administrative attorney (with 50 years of practice) and an oncologist (with 50 years of practice, and recognized author and academic).  He has one sibling; a brother, also an attorney. The defendant's parents remain supportive and have submitted letters for this Court's consideration.  His father expressed his unconditional love and support for the defendant and described his son as a good son, husband, father, brother and friend. He also noted the defendant's willingness to help the neediest of their neighbors.

The defendant grew up in an intact family under upper-middle socioeconomic conditions under loving but strict conditions.   Education was important and encouraged by his parents.  The defendant excelled in this area as noted in ¶s 177 through 180 of the PSR, graduating from all programs **cum laude** or with highest academic honors.

Alvaro Ledo Nass is an attorney by profession.  During his private legal practice between 2004 through the end of 2011, Ledo was an Associate Professor of Public

Law in Monteavila University in Caracas, an Assistant Professor of Public Law in Catholic University Andres Bello (UCAB), and Central University of Venezuela (UCV). Ledo Nass is the Founder Member of Institute for Investigation of Public Law in Monteavila University Caracas.   During this time, he wrote approximately 12 academic papers.

During his legal career, he excelled in the oil and energy area and in finance and corporate law.  He was hired by international law firms to co-represent its clients in big cases of international concern.  At the end of 2011, top management in PDVSA was looking for a legal technical expert in the area, that could understand and internally manage the big projects and arbitration cases. By recommendation of one of his academic mentors and based on his highly-rated experience and reputation, Ledo Nass was contacted and hired as General Counsel of Corporacion Venezolana del Petroleo (CVP), a 100% owned subsidiary of PDVSA in charge of all projects in association with private oil companies.  By the end of 2012, at only 32 years of age, Ledo Nass was selected to become Secretary of the Board of PDVSA, and in between September 2014 to March 2015 he was also appointed as General Counsel of PDVSA. There, the defendant found a very different atmosphere from his life in academics and his private legal practice.  Corruption was common and the foreign currency exchange schemes using loan contracts with PDVSA and the payment of bribes was ongoing. Ledo Nass found outside influences and the struggles for power within his new working environment highly complex and corrupt in employing his responsibilities. Between November 2012 and March 2017 Ledo felt pressure to participate and did

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

participate, as he fully accepts responsibility for the illicit conduct as outlined in his factual proffer.

After only six months as General Counsel of PDVSA, in 2015, and after a threat was made against his life, Ledo Nass resigned his positions and he and his family relocated to Panama where he returned to private practice.  In 2018, he and his family relocated to Spain, where they were living when he decided to surrender and resolve this matter.

The defendant is married with two children, ages 12 and 15; and, a married stepdaughter, age 24.  His wife, Ines Angrisano, is an attorney by profession; however, she has not worked outside the home and is a full-time parent.  She remains completely supportive of the defendant, describing him as an exceptional husband and father.  In fact, she has relocated her family and her life, following the defendant to Panama, Spain and then the United States, supporting his steps at righting his wrong and moving on in a law-abiding life.  Ledo Nass is the sole financial support of his family.

The defendant provided several character letters from various people.  Notably, many predate the defendant's involvement in this case.  This evidences the defendant's community service and good deeds have been ongoing and not done just to claim such before this Court for sentencing.

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

The defendant's wife, Ines Valentina Angrisano, wrote a letter for the Court's consideration. She said they met when the defendant was only 21 years old. After excelling in his studies, the defendant concentrated on work and family, becoming a successful professional and an exceptional father and husband. Then, the defendant made a serious mistake at work. Since that time his life has not been the same. She believes that his voluntary admission to this Court evidences an unwavering act of faith, a display of unconditional love and proof of his absolute regret. Further, his acceptance of responsibility and acceptance of the consequences teaches their daughters "by example" that actions have consequences. She remains completely and unequivocally supportive of the defendant.

The defendant's stepdaughter, Isabel Murillo, also wrote a letter for the Court. She said the defendant has helped support her since she was two years old. She described him in positive terms and said he is an example of how she would like the father of her children to be. She expressed gratitude to have been raised by him and has not lost hope that their family will soon have a normal life again. She remains completely supportive of him. Her husband, Jesus Vargas, also wrote a letter to the Court. He said from the moment they met, the defendant opened his home to Mr. Vargas. He expressed complete support for the defendant who has admitted his mistakes and taken positive steps to correct them.

The defendant's 15-year-old daughter, Maria Valentina, wrote a letter for the Court's review. She is an exceptional student and volunteer. Because she does not have legal

8

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

status in the United States, she is unable to apply for a scholarship for college. Thus, after high school graduation she will relocate to Europe to attend a university. She is aware of the defendant's case and remains completely supportive of him. She said he is taking responsibility for the consequences of his actions which is what he has always told his children to do. The defendant's 12-year-old daughter, Leticia, wrote that the defendant is her best friend and the person she admires the most. She said he told her that in his last job he made a big mistake, but wanted to fix it and that is why she has come to the U.S. with him "to tell the truth." She is completely supportive of him.

Marcos Saldubehere wrote that he met the defendant when they were neighbors in Panama during 2016. Their respective daughters were friends. Mr. Saldubehere noted he had a difficult time during his stay in Panama since his wife was battling cancer. The defendant and his family provided invaluable emotional and spiritual support to them and they attended church together during that time. The two families reunited again in 2022, in the United States. Although he does not know the exact reasons for his judicial case in the United States, Mr. Saldubehere has observed in the defendant a sincere sense of remorse and a notable maturity.

Rosa Andreina Angrisano Agudo met the defendant (who is now her brother-in-law) 23 years ago, when she was a lawyer and he was attending law school. She described him as a young, polite and disciplined student who prioritized his studies which led him to achieve honors at the university. She recalls that despite being the youngest

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

member of their study team, they chose to go to him for their consulting needs
because his knowledge and experience were greater than the students who were
graduating. Because of his principles, his dedication, his belief in God and his quality
as a human being, Ms. Angrisano and her former husband chose the defendant to be
the godfather to their two daughters.   He assisted her during her divorce – not only
with the legal aspect of it but also providing emotional support and personal
assistance. As a husband and father, Alvaro has proven to be unbeatable. He has
instilled necessary values and principles in his daughters. He has made a mistake like
all human beings do – and he has already been paying for it for several years through
moves and being apart from his nuclear family. She asks the Court to have mercy on
him and be lenient.

Community leaders advised the defendant was a "great contributor" and community
service volunteer to low-income families who live in several rural communities
(Tusmare Abajo, La Garrapata and Corralito) of Venezuela.  He also provided financial
support when needed.  Community leaders provided a character letter in support of
the defendant dated October 3, 2021. In June 2022, Jose Celestino Rojas wrote a
personal reference that he has known the defendant for ten years and the defendant
is a responsible person with deep-rooted Christian principles.

In 2015, the Venezuelan Journal of Oncology commended the defendant for his legal
efforts in updating their web platform.  In 2006 and again in 2020, the Venezuelan

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

Society of Oncology wrote a letter thanking the defendant for providing free legal services and for being a part of their volunteer social servants.

The defendant submitted several character letters in his support from religious institutions.  In September 2020 and on behalf of "Our Senora del Carmen" located in Venezuela, the defendant was described as a serious, honest, responsible person with impeccable behavior. A retired Bishop wrote the defendant showed himself as a practicing Catholic and cared for the neediest people.  He described the defendant as a serious, honest and responsible person. In May 2023 a member of Free Life Church in Leesburg, Virginia wrote that she has known the defendant for 15 years and he is of excellent moral character.

While Ledo has been under pretrial supervision only since February 28, 2023, he voluntarily came to the United States to surrender and cooperate in November 2021. Ledo is highly likely to do well on supervised release or probation based on his exemplary performance while at liberty before his arrest (since November 2021), and later on pretrial services supervision since his voluntary surrender and arrest in February 2023.   No violations have been filed as he is fully compliant with his conditions and he has maintained contact with the government the entire time.

### No Criminal History

Mr. Ledo Nass has no criminal history of any kind.  He is a 43-year-old defendant with absolutely no prior arrests or convictions, placing him in the lowest possible criminal

history category of I with zero criminal history points.  Mr. Ledo Nass is a true first offender.  As such, he is among the category of offenders who present the lowest risk to reoffend.

The Sentencing Table in Chapter Five, Part A of the Guidelines Manual comprises two components: offense level and criminal history category. Criminal history forms the horizontal axis of the table and is divided into six categories, from I (lowest) to VI (highest). Chapter Four, Part A of the Guidelines Manual provides instructions on how to calculate a defendant's criminal history category by assigning points for certain prior convictions. Criminal History Category I includes offenders with zero criminal history points and those with one criminal history point. Accordingly, the following types of offenders are classified under the same category: (1) offenders with no prior convictions; (2) offenders who have prior convictions that are not counted because they were not within the time limits set forth in subsection (d) and (e) of §4A1.2 (Definitions and Instructions for Computing Criminal History); (3) offenders who have prior convictions that are not used in computing the criminal history category for reasons other than their "staleness" (eg., sentences resulting from foreign or tribal court convictions, minor misdemeanor convictions, or infractions); and (4) offenders with a prior conviction that received only one criminal history point.

Recidivism data analyzed by the Sentencing Commission suggest that offenders with zero criminal history points (zero-point offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the

offenders in Criminal History Category I with only one criminal history point. [See U.S.

SENTENCING COMMISSION, RECIDIVISM OF FEDERAL OFFENDERS RELEASED 2010

(2021), https://www.ussc.gov/research/research-reports/recidivism-federal-

offenders-released-2010]    Among other findings, the research reflected on this

report concluded that "zero-point" offenders were less likely to be rearrested than

"one point" offenders (26.8% compared to 42.3%), the largest variation of any

comparison of offenders within the same Criminal History Category.

As a result, the Commission has promulgated an amendment to Chapter 4 of the

Guidelines to address these zero-point offenders.  In new § 4C1.1, effective November

1, 2023, offenders who meet all of ten criteria listed are eligible to receive a two-level

decrease in their offense level under Chapters Two and Three.  Mr. Ledo meets all

criteria listed (see our objections to the PSR filed May 24, 2023 under D.E. 20).  As

such, Mr. Ledo asks this Court to give him credit, in the form of a variance, for this

amendment.  Notably, the parties have consulted and want the Court to know that

should the Court agree and give Mr. Ledo Nass credit for this upcoming amendment,

the defendant will not come before the Court after November 1, 2023, and ask for this

two-level reduction.

**However, Mr. Ledo's criminal history is "cleaner" than the zero-point offender.**

These zero-point offenders can have prior convictions that are not counted because

they were not within the time limits set forth in subsection (d) and (e) of §4A1; and/or

prior convictions that are not used in computing the criminal history category for

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

reasons other than their "staleness" (eg., sentences resulting from foreign or tribal court convictions, minor misdemeanor convictions, or infractions). They can also have prior contact with the criminal justice system that did not result in a conviction.

**Mr. Ledo has *no prior contact with the criminal justice system*.** Thus, Mr. Ledo Nass asks that this Court take his clean record into account when fashioning the appropriate sentence in this case.

### Physical and Mental Health

Alvaro Ledo Nass is a 43-year-old man with a history of physical and mental health problems. He had a heart attack when he was only 27 years old, and was treated with a stent. He has lived with a heart condition ever since. He has high blood pressure, high cholesterol, coronary heart disease and metabolic syndrome. He takes numerous medications. His doctors said he needs to be close to a medical facility that can take care of cardiac patients and requires close medical supervision. See PSR at ¶s 167 – 170.

In addition, the defendant has a mental and emotional condition, to include depression, generalized anxiety disorder and generalized panic disorder. He takes several medications for these conditions as well. The defendant asks this Court to consider that his heart condition is affected by, and often exacerbated by, his mental and emotional condition.

14

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

While some people feel Covid-19 is old news, it is still one of the leading causes of death in the United States.  In fact, in a Washington Post article dated May 5, 2023, "The White House recently received a sobering warning about the potential for the coronavirus to come roaring back, with experts reaching a consensus that there's a roughly 20 percent chance during the next two years of an outbreak rivaling the onslaught of illness inflicted by the omicron variant." https://www.washingtonpost.com/health/2023/05/05/covid-forecast-next-two-years/   The defendant notes that while he has been vaccinated against Covid, the defendant does have several of the medical conditions cited by the Centers for Disease Control (diabetes and heart conditions) that may make him severely ill if he contracts Covid, which is still possible for the vaccinated.  The defendant asks this Court to take his health into consideration when fashioning an appropriate sentence, and to consider 28 U.S.C. § 994(j) that directs that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense.

**Sentencing Parity**

According to court records of co-conspirators, the most culpable category ("Level 1") of defendants would be those who masterminded and benefitted from the schemes, and who bribed the foreign officials to obtain access to the PDVSA loan contract which allowed them to gain the illegal proceeds, and who also laundered the proceeds for their and other co-conspirators' benefit.  The next level of culpability ("Level 2") involves the bribe recipients, the money launderers, and the facilitators of the money laundering.  Within this level, the culpability varies based on the nature of their job(s).

15

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

This level includes Urdaneta, Hernandez-Frieri, Ortega and Ledo.  The next level
("Level 3") would be those connected to the money launderers and others involved in
the criminal conspiracy.

Urdaneta was a foreign official who received bribes and engaged the services of an
individual who laundered his illegal proceeds for his own benefit.  In addition, he
created the legal mechanism by which the Companies C-D Loan Scheme operated and
drafted the loan contract.  A similar legal mechanism and loan contract were utilized
in the Eaton-Rantor Loan Scheme in which Urdaneta agreed not to interfere in the
loan approval process.   Urdaneta personally obtained over $49 million in U.S.
currency in bribe payments in exchange for his corrupt acts and decisions in his
capacity as Legal Counsel for the Venezuelan Ministry of Oil, which was the
Venezuelan ministry responsible for the oversight of PDVSA. This was via two
separate schemes over the course of more than a year between 2012 and 2017. In
addition, Urdaneta directed an individual who later became a Cooperating Source
("CS") to receive and launder an additional €78.8 million in Euros of illicit funds.
Urdaneta's advisory guideline sentence was 120 months.  He was sentenced to 52
months imprisonment.

Hernandez-Frieri was a sophisticated, international businessperson with a law
degree, who repeatedly used his financial advisory firm, Global Security Advisors
("GSA"), and other entities under his control, including Global Securities Trade
Finance ("GSTF"), to launder over $12 million obtained, in part, from Ortega, which

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

were bribe payments in exchange for Ortega's corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at PDVSA.  He was sentenced to 46 months imprisonment.

Ortega was a foreign official who took part in joint-venture schemes and agreed to accept over $15 million in U.S. currency in bribe payments in exchange for his corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at PDVSA over a two-year period between 2012 and 2014. As such, Ortega was in an "Executive level." Ortega then conspired to launder $12 million in U.S. currency of those bribe payments between 2016 and 2017 through accounts in the United States. (This was all after Ortega had worked for PDVSA for approximately 12 years and had amassed a tremendous amount of knowledge about the inner-workings of the company.) Ortega used a U.S.-based money launderer, Hernandez-Frieri, to help him conceal the bribe payments and to provide him access to them.  After consideration of a §5K1.1 motion by the government, and factoring any defense arguments for a § 3553(a) variance, Ortega was sentenced to 28 months imprisonment.

Matthias Krull was a Swiss banker who assisted in facilitating the laundering of the proceeds obtained from the corrupt loan contract. Krull never actually held or controlled any proceeds from the underlying conduct (forfeiting the $600,000 he received in referral fees) yet was charged and sentenced based on the whole amount of the conspiracy, approximately $1.2 billion (10 years). Krull facilitated contact with

17

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

other money launderers and other co-conspirators. He was subsequently re-sentenced to 15 months imprisonment, pursuant to 18 U.S.C. § 3553(a), (e).

Ledo is the least culpable of the Level 2 offenders sentenced to date. He was the youngest of all of these defendants at the time he started working for PDVSA. He took less money, worked with PDVSA for considerably less time, was recruited by Urdaneta who was already involved; and, was involved in fewer fraudulent schemes. Ledo held positions under the Executive level held by Ortega. Ledo's involvement and influence facilitated the loan's advancement through the approval process.

## Forfeiture

Alvaro Ledo Nass has agreed to forfeit, to the United States, every penny in illicit bribes he received as a result of this case. To date, he has agreed to forfeit $11.5 million in funds currently held by him, or his family who have surrendered the funds. The funds are available as of this writing.

## Rehabilitation

Mr. Ledo Nass is a lawyer by profession. In anticipation of losing the privilege to practice law because of the instant conviction, Mr. Ledo Nass is preparing for a career switch into software and web development. In this regard, Mr. Ledo Nass is currently enrolled in a Massachusetts Institute of Technology (MIT) program to obtain a Professional Certificate in Coding. This is not a vocational certificate. This is not an entry-level program. It required Ledo to study for approximately one year to become

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

proficient enough in the elements and foundations of any program language (variables, data types, control flows and languages as Java and Phyton), in order to qualify and enroll in this course.  It is a 32-week online program with a required commitment of 15-20 hours per week to become a full stack developer.  The MIT X Pro is not only a highly regarded and recognized program provided by the institution, but also provides comprehensive understanding and skills designing and testing programs, data structures and algorithms, required by a full stack developer who handles the entire product build-out, including the development on the client-side (front-end) and the server-side (back-end) of software. Full-stack developers work with the front-end software the client interacts with, as well as the coding and structuring of the server end. Mr. Ledo's goal is to become a service provider with his own company and will voluntarily not work in the field of oil and gas, or in the legal field.

### Aims of Sentencing

**In addition to the substantial assistance reduction under § 5K1.1/18:3553**, and as mentioned previously, the Court has the discretion to consider a variance under the totality of the §3553(a) factors, and other factors that make unique his cooperation, rather than rely solely on the sentencing guidelines.  In this case, there are several mitigating factors, including the defendant's ongoing cooperation, including additional cooperation factors that will be raised and discussed by counsel at the time of sentencing.   This will include, but not be limited to, additional and ongoing cooperation; his voluntary surrender with no paper at his own expense,

US v Alvaro Ledo Nass
Sentencing Memorandum
Case No. **23-CR-20089**

together with his performance on pretrial, the unlikelihood he will recidivate, his complete lack of criminal history and his family circumstances.

Section 3553(a)(2) instructs the Court to craft a sentence that reflects the seriousness of the offense (just punishment) and promotes respect for the law, while at the same time recognizes the value and likelihood of rehabilitation.   Alvaro Ledo Nass has cooperated fully with the government and the Court.   He continues to do so.   Alvaro Ledo Nass clearly understands the severity of his offense. He is completely repentant. He has done everything in his power to right this wrong.   He will not recidivate. This Court will not see Alvaro Ledo Nass again.   He deserves a sentence less than any defendant that has been sentenced in this case as will be more fully explained at the time of sentencing. A sentence of imprisonment may be better served by a sentence of home confinement so he can finish his education, maintain his family ties and support his family who have uprooted their lives to follow him and support him in his attempts to resolve this matter.

Respectfully submitted,

**OSCAR S. RODRIGUEZ, LLC**
4500 S. LeJeune Road
Coral Gables, Florida  33146
Telephone:  305.445.2000
Facsimile:   305.445.9007
E-mail:   osrlaw@aol.com

/s/ Oscar S. Rodriguez
Oscar S. Rodriguez, Esq.
F.B.N. 194325