UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20089-WILLIAMS

**UNITED STATES OF AMERICA**

vs.

**ALVARO LEDO NASS,**

    **Defendant.**

_____/

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Alvaro Ledo Nass (the "Defendant") is scheduled to be sentenced Monday, June 12, 2023. The Government respectfully submits this memorandum in connection with that sentencing.

**I.    PRELIMINARY STATEMENT**

The Defendant, a sophisticated public servant with a law degree, conspired to launder more than $1.2 billion in U.S. currency, in part, through accounts in the United States. The defendant personally profited over $11.5 million in bribe payments in exchange for his corrupt decisions in his official capacity as General Counsel of Venezuela's state-owned and controlled oil entity, Petróleos de Venezuela, S.A. ("PDVSA"). Such conduct by a high-ranking Venezuelan official warrants appropriate punishment.

As the General Counsel of PDVSA, the Defendant's role was crucial to the success of the schemes. He was a high-ranking foreign official who accepted bribes from his co-conspirators in exchange for not interfering in his official capacity in the approval of corrupt foreign currency exchange loan contracts that allowed his co-conspirators to take advantage of the unofficial exchange rate for the Venezuelan bolivar and loan back PDVSA Venezuelan bolivars at the

Venezuelan government's fixed rate of exchange (which overvalued the bolivar), pocketing massive profits because of the arbitrage. In addition to the foreign currency exchange loan contract schemes, the Defendant also participated in his official capacity in several corrupt joint venture schemes involving PDVSA. Once done, the Defendant received what he had been promised in exchange for all of these schemes—bribe payments totaling more than $11.5 million—which the Defendant, along with other co-conspirators, concealed through the creation and use of shell companies and offshore bank accounts.

The Defendant must be held to account. Foreign corruption is a plague with great impact where it takes place, with serious consequences here in the United States. Corruption undermines the rule of law, empowers authoritarian rulers, distorts free and fair markets, disadvantages honest and ethical companies, threatens national security and sustainable development, and is deeply unfair to everybody else who plays by the rules. The Defendant's sentence must send a strong warning to those who would choose to use the United States financial system to conceal their corruption, both here and abroad.

The Defendant faces an effective Guidelines term of 120 months' imprisonment. This range appropriately reflects the serious nature of his extensive and deliberate criminal conduct. The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and deterrence, and after considering the Government's motion pursuant to §5K1.1 of the United States Sentencing Guidelines which will be made orally at the sentencing hearing, the Court should impose a sentence of 96 months.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On February 24, 2023, a One Count Information was filed charging the Defendant with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). [DE 1]. The charge

arose from the Defendant's role in a bribery and money laundering scheme. In furtherance of the scheme, the Defendant sought to unlawfully enrich himself and his co-conspirators by accepting bribe payments, as Defendant was a high-ranking Venezuelan government official, to ensure that co-conspirators were able to obtain improper business advantages, including the Defendant not interfering in the approval of foreign currency exchange loans' process and then to promote those bribery schemes through financial transactions that occurred, in part, in the United States. As the Defendant's factual proffer makes clear, the Defendant received over $11.5 million in bribes from his co-conspirators. The defendant's criminal conduct is more fully described below and in his signed Factual Proffer [DE 14].

On March 29, 2023, the Defendant pleaded guilty to the one-count Information [DE 15].

### III. APPLICABLE PENALTIES

For the reasons set forth below, (1) the applicable Guidelines term of imprisonment for the Defendant is 120 months imprisonment; (2) forfeiture is mandatory on the offense of conviction and was ordered in the amount of $11,510,025; and (3) the Court has discretion to order the Defendant to pay a fine.

1. **The Applicable Guidelines Term**

The government respectfully submits that the appropriate Guidelines calculation is set forth below:[1]

---

[1] The Government differs only slightly from the Probation Office's Guideline calculations. In short, the Government concurs in the Probation Office's calculations, however, the Government objects to the inclusion of the four-level enhancement pursuant to § 2C1.1(b)(3) of the U.S.S.G. as it was not outlined in paragraph 13 of the plea agreement. [DE 15]. The Government does acknowledge that, but for the plea agreement between the parties, the four-level enhancement in Defendant's base offense level pursuant to § 2C1.1(b)(3) of the U.S.S.G. would be appropriate as the Defendant was general counsel at PDVSA and in that position had substantial influence over the decision-making process at the Venezuelan government entity. See U.S.S.G. § 2C1.1(b)(3), cmt. n.4(A).

In addition, the Government objects to the two-level enhancement pursuant to § 3B1.3 of the U.S.S.G. based on the defendant abusing a position of public or private trust in a manner that significantly facilitated the commission or concealment of the money laundering offense. First, in the plea agreement, the United States agreed that it would not

3

| | |
|---|---|
| Base Offense Level (USSG § 2S1.1(a)(1)): | +36 |
| (SUA is FCPA calculated pursuant to USSG § 2C1.1, including base offense level 14 public official, more than one bribe, value of benefit received in excess of $9.5 million) | |
| Conviction Under 1957 (USSG § 2S1.1(b)(2)(B)): | +1 |
| Acceptance of Responsibility (USSG§ 3E1.1(a)): | -2 |
| Assistance in Pleading Guilty (USSG § 3E1.1(b): | -1 |
| Total Offense Level: | 34 |

The Defendant has a criminal history score of zero, and thus a criminal history category of I. Based on the total offense level of 34 and a criminal history category of I, the Defendant's Guidelines range of imprisonment is 151 – 188 months' imprisonment. However, because the offense has a 10-year statutorily authorized maximum sentence, pursuant to Section 5Gl.l(a), the advisory sentencing guideline range is 120 months of imprisonment.

**2.    The Court is Required by Statute to Order Forfeiture**

Under 18 U.S.C. § 982(a)(1), the Defendant must forfeit all property "involved in" his money laundering offense. *United States v. Waked Hatum*, 969 F.3d 1156, 1165 (11th Cir. 2020) ("a person convicted of federal money laundering 'must forfeit to the government all property that is either involved in that violation or traceable thereto'") (citation omitted). The property "involved in" money laundering includes the property actually laundered ("the corpus"), which here is the bribes that defendants accepted. *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009). And in a conspiracy, as here, the defendant must forfeit *all* laundered amounts, and not just the amounts involved in the substantive charges or overt acts.

---

recommend to the Court and Probation any other adjustments save for Acceptance of Responsibility in accordance with Paragraph 7 of the plea agreement and Section 3E1.1 of the U.S.S.G. [*Id.*] Further, even if the Government had not made this agreement, the § 3B1.3 "adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. Because § 2C1.1(a)(1) includes a two-level enhancement for public official role in the base offense level and § 2C1.1(b)(3) includes a four-level enhancement in the specific offense characteristics the Government submits that it would be error to also include the two-level enhancement under § 3B1.3.

*Seher*, 562 F.3d at 1373 ("as he was convicted of conspiracy to launder money, it is reasonable to hold him liable for all the proceeds that were a reasonably foreseeable result of that conspiracy regardless of whether he still possesses them"); *United States v. Baker*, 227 F.3d 955, 969 (7th Cir. 2000) (defendant forfeits total amount of proceeds involved in the conspiracy, not just amount involved in substantive offenses or overt acts).

Here, forfeiture is warranted in the total amount of the Defendant's bribes, his illegally obtained gains from the schemes, which there is no dispute between the parties is at least $11,510,025. [DE 14 ¶11]. In fact, the Court has already granted an order of forfeiture in this matter. *See* Order of Forfeiture, DE 26.

### 3. The Court Has Discretion to Order the Defendant to Pay a Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a). Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that a fine will impose upon the defendant and any dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).

The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id*. The Defendant bears the burden of demonstrating an inability to pay a fine at present and in the future.

Here, as set forth in the PSR, no restitution is warranted. [*See* DE 17 ¶136 and DE 24 ¶136]. As a result, whether a fine will impose a "burden" on the defendant and whether a fine, taken together with other sanctions, is sufficiently "punitive," will depend on the amount of forfeiture the Court ultimately imposes. As set forth in Defendant's PSR, the maximum fine is $23,020,050.

The Probation Office has concluded, based on a review of the financial information that the Defendant provided to the Probation Office, that he does have the ability to pay a fine. [*See* DE 17 ¶197 and DE 24 ¶197]. The Government recommends a fine which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## IV.     LEGAL STANDARD

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id*. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history andcharacteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

V. **A SUFFICIENT TERM OF IMPRISONMENT IS WARRANTED**

A sentence of incarceration is warranted here given the nature and seriousness of the Defendant's criminal offense, the Defendant's history and characteristics and the need for general deterrence. *See* 18 U.S.C. § 3553(a). For these reasons, and the reasons supporting the Government's motion pursuant to U.S.S.G. § 5K1.1, the Government respectfully submits that the

Defendant be sentenced to a term of imprisonment of 96 months, a sentence sufficient, but not greater than necessary, to satisfy the goals of sentencing.

**1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

First, the nature and circumstances of the Defendant's participation in a money laundering and bribery scheme involving more than a billion dollars and over eleven million dollars in bribe payments warrants a significant sentence. The Defendant, a high-ranking foreign official, accepted more than $11 million in bribes from his co-conspirators in exchange for his participation in the bribery scheme, including not interfering in the foreign currency exchange loan process and his facilitation of bribe payments to co-conspirators. The Defendant and his co-conspirators concealed those bribe payments through the creation and use of shell companies and offshore bank accounts, and then extravagantly benefitted from those bribe proceeds. Further, the Defendant's criminal activity in this case was not isolated; on the contrary, it extended over the course of years and the Defendant acting knowingly and deliberately.

Second, as to the Defendant's personal history and characteristics, there is nothing remarkable about the Defendant's age, education, physical or mental capacity, or family circumstances that suggest that he cannot be imprisoned for a term appropriate to his crime. He may argue that he is entitled to leniency because he has no criminal history. While it is true that the Defendant has no prior criminal record, the Defendant admitted in his factual proffer that he participated in a separate money laundering scheme, involving the same type of foreign currency exchange, as well as joint venture schemes that spanned years; this conduct was not an isolated act. [DE 14 at 11].

Simply put, the Defendant's personal history and characteristics do not justify a substantial deviation from his Guidelines range, a range that is consistent with the nature and circumstances of his offense.

**2.  The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The Defendant's offense was extremely serious.  Bribery and money laundering have significant negative consequences at home and abroad and have consistently been recognized by leaders of this country for the harm they cause.

In 2021, President Joe Biden highlighted this reality, "[c]orruption threatens United States national security, economic equity, global anti-poverty and development efforts, and democracy itself."[2]  In 2006, President George W. Bush similarly observed that "the culture of corruption has undercut development and good governance and . . . impedes our efforts to promote freedom and democracy, end poverty, and combat international crime and terrorism."[3]

As for money laundering, the U.S. Department of State explained in 2001:

> Money laundering has devastating social consequences and is a threat to national security. It provides the fuel for drug dealers, terrorists, illegal arms dealers, *corrupt public officials* and other criminals to operate and expand their criminal enterprises. Crime has become increasingly international in scope, and the financial aspects of crime have become more complex, due to rapid advances in technology and the globalization of the financial services industry. Modern financial systems, in addition to facilitating legitimate commerce, permit criminals to order the transfer of millions of dollars instantly, using personal computers and satellite dishes. The criminal's choice of money laundering vehicles is limited only by his or her creativity. Money is laundered through currency exchange houses, stock brokerage houses, gold dealers, casinos, automobile dealerships, insurance companies, and trading companies. Private banking facilities, offshore banking, shell corporations, free trade zones, wire systems, and trade financing all have the ability to mask

---

[2]  Fact Sheet: US Strategy on Countering Corruption, *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/06/fact-sheet-u-s-strategy-on-countering-corruption/.

[3] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2006/08/20060810 html.

> illegal activities. In doing so, criminals manipulate financial systems in the United States and abroad.
>
> Unchecked, money laundering can erode the integrity of a nation's financial institutions. Due to the high integration of capital markets, money laundering could also adversely affect currencies and interest rates as launderers reinvest funds where their schemes are less likely to be detected, rather than where rates of return are higher.
>
> Ultimately, this laundered money flows into global financial systems where it could undermine national economies and currencies. Money laundering is thus not only a law enforcement problem but poses a serious national and international security threat as well.[4]

This assessment remains accurate today and the sentence imposed should reflect the seriousness of the Defendant's offense as well as the threat posed by corruption and money laundering more generally as discussed above.

### 3. The Need for Adequate Deterrence

This factor also weighs in favor of a substantial sentence. It is particularly challenging to investigate and successfully prosecute international money laundering and corruption schemes, especially where, as here, the scheme involves individuals and actions in multiple countries, foreign bank accounts, and other evidence that is located abroad. This means that when such a scheme is uncovered, and a defendant convicted, a substantial sentence is warranted. *See, e.g., United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than

---

[4] U.S. Department of State, Money Laundering and Financial Crimes Report, *available at* https://2009-2017.state.gov/j/inl/rls/nrcrpt/2000/959.htm (emphasis added).

sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Thus, the Court should impose a sentence significant enough to deter others from using the United States financial system to launder their illicit funds.

### 4. To Protect the Public From Further Crimes of the Defendant

The Government submits that this factor is not a central basis for sentencing in this case and notes that the Government does not believe that the defendant is likely to commit future crimes.

### 5. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

The Government submits that these factors are not a central basis for sentencing in this case.

### 6. The Kinds of Sentences Available

The Government submits that this factor does not affect the analysis. There can be no serious argument for any sentence other than imprisonment for this defendant who abused his public trust by accepting bribe payments and pleaded guilty to conspiracy to commit money laundering.

### 7. The Kinds of Sentence and the Sentencing Range

As discussed above, the defendant's advisory guidelines sentence is 120 months' imprisonment. The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, and after considering the Government's motion pursuant to §5K1.1 of the United States Sentencing Guidelines, the Court should impose a sentence of 96 months.

11

### 8. Any Pertinent Policy Statement Issued by the Sentencing Commission

There are no policy statements in the Sentencing Guidelines that justify a substantial variance for the Defendants. The Government reserves the right to supplement our position based on any relevant filing the Defendants may submit implicating other policy statements.

### 9. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The purpose of the Sentencing Guidelines is to ensure "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. Ch. 1.3.

The Defendant's case, while charged separately, is, in part, related to nine other co-defendants first charged by complaint in *United States v. Francisco Convit Guruceaga, et al.*, 18-CR-20685, Dkt. No. 3 (S.D.F.L. Aug. 18, 2018). The co-defendants, like here, were charged for their roles, in part, in a massive $1.2 billion money laundering conspiracy involving bribery of PDVSA officials, among others, to obtain a loan contract that essentially functioned as a foreign currency exchange contract. [*Id*. at Dkt. No 19]. As discussed in the Government's sentencing memorandum for Abraham Edgardo Ortega [*Id*. at Dkt. No. 393], those indicted in the conspiracy fall into five categories or bands, which include, based on the timing of their respective involvement: (1) two foreign officials (Carmelo Urdaneta Aqui and Ortega) who agreed to accept bribe payments for their roles in facilitating the currency exchange loan and other contracts and then engaged others to launder their proceeds; (2) one individual (Convit) who agreed to pay bribes to the two foreign officials in exchange for the loan contract and then laundered his proceeds; (3) three individuals (co-defendant Gustavo Adolfo Hernandez Frieri ("Hernandez"), Amparan, and Gois) who agreed to assist in laundering the illegal proceeds obtained as a result of the loan contract and facilitated the laundering of the illegal proceeds; (4) one individual (Marcelo Federico

Gutierrez Acosta y Lara) whose bank was used by the defendant in an attempt to launder Ortega's bribery proceeds; and (5) one individual (Mario Enrique Bonilla Vallera) who acted as a strawman for as yet unindicted co-conspirators.

Also charged in the same complaint as those indicted above (along with reference to nine unnamed co-conspirators and three additional Venezuelan officials) but pleading guilty to a separate one count information charging him with the money laundering conspiracy, was Matthias Krull ("Krull"), a Swiss banker who assisted in facilitating the laundering of the proceeds obtained from the corrupt loan contract. Krull was brought into the conspiracy by Co-Conspirator 7 and his role was to facilitate the laundering of Co-Conspirator 7's illegal proceeds obtained as a result of the corrupt loan contract. This involved Krull introducing Co-Conspirator 7 to other banks and individuals that would launder Co-Conspirator 7's proceeds. [*See* Case No. 18-CR-20682-CMA, Krull Factual Proffer, ¶¶ 24-25, ECF No. 30.] Krull never actually held nor controlled any proceeds from the underlying conduct (forfeiting the $600,000 he received in referral fees) yet was charged and sentenced based on the whole amount of the conspiracy, approximately $1.2 billion in U.S. currency. Arguably, Krull falls into a separate category or band of facilitators. This band would include those like Krull who facilitated contact with other money launderers and other co-conspirators.

As summarized in the chart below, Krull, Hernandez, Ortega, and Urdaneta are the only individuals who have been sentenced in the conspiracy to date:

| Name | Case/Judge | Offense | Approximate Bribes Laundered | Guidelines | Sentence | Post-Sentence R-35 Reduction |
|---|---|---|---|---|---|---|
| Matthias Krull | 18-20682 (Altonaga, SDFL) | 18 U.S.C. § 1956(h) with a § | $1.2 billion ($600,000 forfeiture for referral fee) | 360 months to life; statutorily | 120 months $600,000 forfeiture | 42 months (Sept. 9, 2020) |

13

| Name | Case/Judge | Offense | Approximate Bribes Laundered | Guidelines | Sentence | Post-Sentence R-35 Reduction |
|---|---|---|---|---|---|---|
| | | 1957 object | | capped at 120 months | (Oct. 29, 2018) | |
| Gustavo Hernandez Frieri | 18-20685 (Williams, SDFL) | 18 U.S.C. § 1956(h) with a § 1956 object | $12.3 million ($12.3 million forfeiture) | 97-121 months | 46 months $12.3 million forfeiture (April 30, 2021) | N/A |
| Abraham Edgardo Ortega | 18-20685 (Williams, SDFL) | 18 U.S.C. § 1956(h) with a § 1957 object | $12 million ($12 million forfeiture) | 63-78 months | 28 months (5K) $12 million forfeiture (May 5, 2021) | Appx. 22 months |
| Carmelo Urdaneta Aqui | 18-20685 (Williams, SDFL) | 18 U.S.C. § 1956(h) with a § 1957 object | $49,265,050 ($49,265,050 forfeiture) | 168-210; statutorily capped at 120 months | 52 months $49,265,050 forfeiture (June 15, 2022) | N/A |

After the Defendant, who was an unnamed co-conspirator in the original complaint discussed above, voluntarily self-surrendered from Spain to resolve his criminal conduct in the United States, the United States filed an Information against the Defendant charging him with the money laundering conspiracy with an object of the conspiracy being the engagement in a monetary transaction in criminally derived property with a value over $10,000. [DE 1]. The Information was filed over a year after the Defendant voluntarily came to the United States and began cooperating with law enforcement. Also, as discussed in the Government's Sentencing

14

Memorandum for Ortega, the crime charged and the crime to which the Defendant pleaded guilty involve money laundering of illicit proceeds obtained from bribes paid to him as a foreign official and others, in part, ranking these categories in order of culpability is not an easy task, as the categories cannot be arranged in a clear hierarchy.  This is because money laundering necessarily involves two serious offenses, the laundering as well as the predicate offense (specified unlawful activity) generating the proceeds being laundered.

In the view of the Government, based on all of the information and evidence in this criminal case, the most culpable category would be those individuals who masterminded and benefited from the schemes, and who bribed the foreign officials to obtain access to the PDVSA loan contract which allowed them to gain the illegal proceeds, and who also laundered the proceeds for their and other co-conspirators' benefit.  The next level of culpability involves the bribe recipients, the money launderers, and the facilitators of the money laundering.  Within this level, the participants are nearly equally culpable as they are two sides of the same coin: one involving foreign officials who abused the public trust and accepted a bribe, in this case either by allowing access to a loan contract or not stopping the loan contract from being approved; and the other involving those entrusted to move the illegal proceeds so that the bribe recipients and the others who benefited from access to the loan contracts could hide and use their proceeds.  The final level would be those connected to the money launderers and others involved in the criminal conspiracy.

The Defendant falls into the second tier of these delineated categories – a foreign official who received bribes and engaged the services of an individual who laundered his illegal proceeds for his own benefit.  In exchange, the Defendant, as General Counsel of PDVSA, agreed not to interfere in the foreign currency exchange loan contract approval process.

At Ortega's sentencing hearing on May 5, 2021, the Government viewed Ortega as being in the same band or category as Hernandez, yet slightly more culpable as he was a foreign official who took part in a joint-venture schemes in which he took bribes and was paid a bribe from the Company C-D Loan Scheme, and because he used a United States based money launderer, Hernandez, to help him conceal the bribe payments and to provide him access to them. The Court agreed finding that Ortega's culpability was "higher than that of Mr. [Hernandez] Frieri, since it is his conduct, his corrupt acts that led to the laundering of the funds" [Ortega Sentencing Tr. 39, 18-CR-20685, Dkt. No. 419] and noted Ortega's substantial ongoing cooperation when sentencing him to 28 months' imprisonment. At Urdaneta's sentencing hearing on June 16, 2022, the Court agreed with the Government that Urdaneta was the most culpable to be sentenced in this conspiracy to date "because of his role, the extent of his complicity, and the fact that he was a lawyer," and that he had greater responsibility that Ortega. [Urdaneta Sentencing Tr. 15:23-25, 16:4-6 (June 16, 2022).]

The Defendant, like Ortega and Urdaneta, falls into that level of culpability band higher than Hernandez. Within that level though, the Government views the Defendant as more culpable than Ortega by virtue of (1) high-ranking position within PDVSA (Ortega as Finance Director reported to another unnamed co-conspirator while Ledo was the General Counsel of PDVSA) (2) the Defendant's actions or inactions in numerous foreign currency loan exchange schemes, including the Eaton-Rantor Loan Scheme, and joint ventures and (3) his facilitation of bribe payments to Ortega and other co-conspirators. The Government, however, views the Defendant as less culpable than Urdaneta because Urdaneta received nearly four to five time as much in bribe payments and held a position at the Oil Ministry which duties included overseeing PDVSA. The

Government is prepared to answer any questions that the Court may have concerning the culpability of the defendant compared to his co-defendants.

### 10. The Need to Provide Restitution to Any Victims of the Offense

There is no issue of restitution in this case, so the § 3553(a)(7) factor is not addressed here.

### CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a term of imprisonment consistent with the applicable advisory guidelines sentence after consideration of the Government's motion pursuant to §5K1.1 of the United States Sentencing Guidelines of 96 months' imprisonment, along with a fine, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

| | |
|---|---|
| GLENN S. LEON | MARKENZY LAPOINTE |
| CHIEF, FRAUD SECTION | UNITED STATES ATTORNEY |
| | |
| By: */s/ Paul A. Hayden* | By: */s/ Kurt K. Lunkenheimer* |
| PAUL A. HAYDEN | KURT K. LUNKENHEIMER |
| Trial Attorney | Assistant United States Attorney |
| Fraud Section, Criminal Division | Court ID No. A5501535 |
| U.S. Department of Justice | U.S. Attorney's Office - SDFL |
| 1400 New York Avenue, N.W. | 99 N.E. 4th Street, Suite 600 |
| Washington, D.C. 20005 | Miami, FL 33132-2111 |
| Telephone: 202-353-9370 | Telephone: (305) 961-9008 |
| Email: paul.hayden2@usdoj.gov | Facsimile: (305) 536-4699 |
| | Email: Kurt.Lunkenheimer@usdoj.gov |